UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIS A. ROBLES SOTO,                    )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )    Case No. 3:18-cv-30134-KAR
                                        )
ANDREW SAUL,                            )
Commissioner of Social                  )
Security Administration,                )
                                        )
        Defendant.                      )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION FOR
ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
(Docket Nos. 14 & 16)


ROBERTSON, U.S.M.J.

        I.      INTRODUCTION

        Luis A. Robles Soto ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner of Social Security ("Commissioner")[1]

denying his application for Social Security Disability Insurance Benefits ("DIB").  Plaintiff

applied for DIB on December 17, 2015, alleging an onset date of August 1, 2014 (Dkt. No. 11,

Administrative Record ("A.R.") 283).  Plaintiff claimed disability due to lower back disc

problems, a problem with his right hip, difficulty walking, a problem with his right knee,

depression, and lumbar spasms (A.R. 311).  His application was denied initially and on

---

[1] The original complaint was brought against Nancy A. Berryhill, Acting Commissioner of
Social Security Administration. Since then, Andrew Saul has been confirmed as the
Commissioner of Social Security and is substituted as the defendant in this action pursuant to
Fed. R. Civ. P. 25(d).

reconsideration (A.R. 139-48, 161-74).  On August 1, 2016, Plaintiff requested a hearing before

an Administrative Law Judge ("ALJ"), and one was held on July 31, 2017 (A.R. 115-38).  On

October 4, 2017, the ALJ issued an unfavorable decision (A.R. 80-107).  Plaintiff sought review

by the Appeals Council, which denied relief (A.R. 1-9).  Thus, the ALJ's decision became the

final decision of the Commissioner, and this suit followed.

Plaintiff appeals from the ALJ's decision on the grounds that the ALJ erred (1) by not

fully adopting the opinion in a consultative evaluation when assessing whether Plaintiff was able

to work; (2) in failing to find that Plaintiff's knee impairment was severe; and (3) in finding that

Plaintiff's statements about the severity of his pain were not fully consistent with the contents of

the medical records and other evidence (Dkt. No. 15 at 8, 10, 15).  Pending before this court are

Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 14) and Defendant's Motion to

Affirm the Commissioner (Dkt. No. 16).  The parties have consented to this court's jurisdiction

(Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the

court will deny Plaintiff's motion and allow the Commissioner's motion.

II.    L<small>EGAL</small> S<small>TANDARDS</small>

A.    <u>Standard for Entitlement to DIB</u>

In order to qualify for DIB, a claimant must demonstrate that he is disabled within the

meaning of the Social Security Act.[2]  A claimant qualifies as disabled if he is unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

---

[2] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB.  *See* 42
U.S.C. § 423(a)(1)(A).

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A

claimant is unable to engage in any substantial gainful activity when he is not only

> unable to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner evaluates a claimant's impairment under a five-

step sequential evaluation process set forth in the regulations promulgated by the Social Security

Administration. *See* 20 C.F.R. § 404.1520(a)(4)(i-v). The hearing officer must determine

whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from

a severe impairment; (3) the impairment meets or equals a listed impairment contained in

Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing

previous relevant work; and (5) the impairment prevents the claimant from doing any work

considering the claimant's age, education, and work experience. *See id; see also Goodermote v.*

*Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step

process). If the hearing officer determines at any step of the evaluation that the claimant is or is

not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the ALJ must make an assessment of the

claimant's residual functional capacity ("RFC"), which the ALJ uses at step four to determine

whether the claimant can do past relevant work and at step five to determine if the claimant can

adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an
> administrative assessment of the extent to which an individual's medically
> determinable impairment(s), including any related symptoms, such as pain, may
> cause physical or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities.

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B.    Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (mem.) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve

conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F. App'x at 6. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.    FACTS

A.    Plaintiff's Background

Plaintiff was thirty-six years old on the date of the hearing before the ALJ. He had graduated from high school and completed one year of college. He can read and write only in Spanish (A.R. 119). As a child, Plaintiff had Perthes disease, also known as Legg-Calvé-Perthes disease, which is "epiphysial aseptic necrosis of the upper end of the femur." Stedman's Medical Dictionary 449 (25th ed. 1990). Plaintiff reported he had previously worked as a housekeeping supervisor, landscaper, security guard supervisor, security guard, and delivery truck loader/unloader (A.R. 120-21, 398).

B.    Records Related to Physical Impairments

On October 23, 2013, Plaintiff presented at Baystate Medical Center ("BMC") Emergency Medicine for treatment of a swollen leg and pain in his right knee after slipping on a step at home (A.R. 729). The emergency medicine notes reviewed Plaintiff's medical history of right hip bacterial infection during childhood and orthopedic surgery on his left knee (A.R. 730). Howard Smithline, M.D., diagnosed Plaintiff with knee sprain/strain, treated his pain, and referred Plaintiff for treatment to New England Orthopedic Surgeons ("NEOS") (A.R. 730-31).

The next medical record is from more than a year later. On February 4, 2015, Plaintiff sought treatment from Baystate High Street Health Center Adult Medicine ("HSHC") for chronic lower back pain and right hip pain that had recently worsened (A.R. 767). Nurse practitioner Leilani Kidder noted that during the exam, Plaintiff appeared distressed with walking and in pain (A.R. 768). Ms. Kidder prescribed naproxen for pain and tramadol for severe pain and ordered an x-ray of Plaintiff's pelvis once his insurance was in place (A.R. 768). Plaintiff did not follow up with physical therapy after an appointment in October 2014 because of problems with insurance (A.R. 767).

On February 17, 2015, Plaintiff had x-rays performed of his right hip and pelvis (A.R. 484-85). On review of the films, Michael George, M.D., noted coxa vara[3] and coxa plana[4] of the right hip and cystic degenerative changes in the head and degenerative changes in the lateral right acetabulum (A.R. 484). Dr. George formed the impression that the coxa vara and plana of the right femoral head were likely due to prior septic arthritis. He reported severe degenerative changes of the acetabulum and humeral head secondary to the abnormal articulation and postsurgical changes in the intertrochanteric right femur.

On March 5, 2015, Plaintiff presented at HSHC for a physical performed by Olubukola Ojewoye, M.D., overseen by Linda Canty, M.D. (A.R. 758). For Plaintiff's personal medical history, Dr. Ojewoye wrote "chronic back pain for past 15 years which patient said doctors told him was due to his previous leg discrepancy[;] [history of] chronic right hip pain for past 15 years secondary to septic arthritis of [right] hip, recent imaging 2/2015 with degenerative

---

[3] Coxa vara is an "alteration of the angle made by the axis of the femoral neck to the axis of the femoral shaft so that the angle is less than 135 degrees; the neck becomes horizontal." Stedman's Medical Dictionary 365.
[4] Coxa plana is another term for Legg- Calvé-Perthes disease. Stedman's Medical Dictionary 365.

changes consistent with previous septic arthritis[;] [left] leg surgery [due to] limb length discrepancy over 15 years ago in Puerto Rico" (A.R. 758). Dr. Ojewoye formulated a plan for Plaintiff that included another referral to NEOS and continued pain treatment with naproxen (A.R. 759).

On March 30, 2015, Plaintiff saw physician's assistant Brian Puchalski at NEOS for an evaluation of his right hip pain (A.R. 469). Plaintiff reported that he had a history of septic arthritis in both his knee and hip and had been dealing with pain for about ten years. The pain worsened with any fast movements and weight-bearing activities, and he had difficult putting on his shoes and socks. Upon examination, Mr. Puchalski noted that Plaintiff walked with a Trendelenburg gait on the right side; range of motion revealed discomfort at the end of range of flexion; there was a positive Stinchfield response for the right, but not the left hip; and 5/5 strength of the hip flexors bilaterally. The x-ray showed severe arthritis of the right hip with subchondral sclerosis and cyst formation, as well as significant wear and flattening of the femoral head and superior wear of the acetabulum.

With the assistance of a Spanish interpreter, Mr. Puchalski and Plaintiff discussed possible treatment options such as the use of a cane and joint injections. Because of Plaintiff's history of septic arthritis, Mr. Puchalski recommended a hip aspiration to make sure there was no occult infection in his joint. They also discussed the possibility of a total hip arthroplasty. Plaintiff agreed to follow up as outlined.

On April 3, 2015, Plaintiff saw nurse practitioner Jalil Johnson at HSHC for his hip and back pain (A.R. 490-91). Plaintiff reported that he was planning to undergo a total right hip replacement through NEOS. He received a refill of his naproxen prescription, which he reported helped with his pain.

On April 6 and 7, 2015, Plaintiff underwent a procedure at BMC for bone marrow and labeled white blood cell imaging to investigate his right hip pain (A.R. 750). The findings revealed photopenia in the right hip and proximal right femur "consistent with previous [avascular necrosis] in the right femoral head." However, there was no "increased metabolic activity to suggest infection" or evidence of right hip septic arthritis or osteomyelitis.

On April 30, 2015, Plaintiff returned to HSHC with disability paperwork from the Massachusetts Department of Transitional Assistance. According to Dr. Ojewoye, Plaintiff reported that he had exhausted his period of disability in March 2015, that he had seen a doctor at NEOS, and that surgery was planned at some point to fix his back. The doctor's notes provided, "We discussed that I cannot truthfully and accurately document why he will need temporary assistance after surgery if I do not have information from a surgeon that he will be doing surgery" (A.R. 753).

On May 14, 2015, Plaintiff returned to Dr. Ojewoye (A.R. 555-56). He reported that he had an appointment scheduled in August at NEOS to be evaluated for hip replacement surgery. Dr. Ojewoye noted that NEOS had diagnosed him with end stage arthritis of the right hip and that there were few conservative options left for him. NEOS recommended a cane, continued use of anti-inflammatories, and possible intra articular injections. The doctor further noted that Plaintiff had been unemployed since August 2014 because "finding a new job has been difficult since (and as is expected) new employers are apprehensive about employing him given his [right] hip arthritis and pain" (A.R. 556).

Plaintiff returned to HSHC every month for the following three months. On June 22, 2015, Dr. Ojewoye remarked that Plaintiff reported no new issues with his back and hip pain, though on severe pain days Plaintiff stayed in bed (A.R. 548). Plaintiff received a prescription

for narcotic pain medication, which he had never used before, with instructions to use it for severe pain (A.R. 549). On July 23, 2015, Plaintiff described a new right foot pain and relayed that the oxycodone prescription had helped with the pain when the Tylenol and Motrin did not (A.R. 542). On August 27, 2015, Plaintiff saw Orlando Torres, M.D., at HSHC and described his low back pain as "severe, stabbing pain, different from the pain in his right hip" (A.R. 531). Plaintiff stated that his pain was worse going up rather than down stairs and that he used a cane to get around. Plaintiff received a referral to physical therapy.

On August 6, 2015, Plaintiff was examined by Jordan Greenbaum, M.D., at NEOS for his right hip pain (A.R. 470-72). Dr. Greenbaum recorded Plaintiff's report of functionality as:

> moderate pain, he requires the railing to go up and down stairs, but can go one foot after another. He can get into and out of a car. He finds it moderately difficult to put on shoes and socks. He can do light labor. He finds it a little difficult to sit comfortably. He walks less than 10 minutes without a cane. He feels he has a moderate limp. He uses a cane most of the time. He remains independent with activities of daily living, and most of his instrumental activities of daily living, however, he is no longer able to work

(A.R. 470).

On musculoskeletal examination, Dr. Greenbaum noted that Plaintiff walked with an antalgic gait on the right, but with no obvious Trendelenburg lurch. Plaintiff had a positive impingement sign and Stinchfield test on the right, but negative on the left. The doctor also noted Plaintiff had a half-inch leg length discrepancy. Upon reviewing Plaintiff's x-rays, Dr. Greenbaum remarked that there were no significant degenerative changes in the left hip, but that the right hip had a mushroom-shaped appearing femoral head with cystic changes. Further, there were two sclerotic lesions in the proximal femoral metaphysis and mild evidence of dysplasia of the acetabulum, though no significant degenerative changes there (A.R. 471). At the end of the evaluation, Dr. Greenbaum concluded that Plaintiff had mild-to-moderate right hip osteoarthritis

secondary to Perthes disease as a child. The doctor opined that the risks of total arthroplasty outweighed the benefits. Therefore, further nonoperative treatment, such as cortisone injections, and further testing, such as imaging of his lower spine, were indicated (A.R. 472). Dr. Greenbaum also remarked, "Finally, although he has a very flattened, abnormal-appearing femoral head and some mild degenerative changes, the joint space is relatively well preserved and, as such, I think to some extent some of his pain and functional limitations are out of proportion to radiographs" (A.R. 472).

On August 13, 2015, Plaintiff underwent an MRI of his lumbar spine (A.R. 475-76). The images revealed mild lateral disc protrusion and degenerative facet arthropathy at L4-5 causing mild right-side foraminal stenosis; mild disc herniation and degenerative facet arthropathy at L5-S1 causing mild foraminal stenosis; lumbar muscle spasm; and a small left renal cyst.

On September 21, 2015, Plaintiff had an initial physical therapy evaluation at Baystate Rehabilitation (A.R. 781-84). Michelle Downs' clinical assessment summary stated that Plaintiff was referred to physical therapy for an abnormal gait; he had chronic right hip pain and decreased mobility; he presented with decreased strength, leg length discrepancy, and decreased gait and balance (A.R. 782). Plaintiff missed the next three appointments (A.R. 780) and was discharged from treatment for failing to appear for his appointments (A.R. 778).

On September 24, 2015, Plaintiff saw Michael Picchioni, M.D., at HSHC for a follow-up appointment (A.R. 524-27). Dr. Picchioni reviewed Dr. Greenbaum's assessment and discussed Plaintiff's pain with him. Plaintiff reported that his pain was a six out of ten during the day (with medication) and an eight out of ten at night, worse with sitting, and had spread to his right groin. Plaintiff also stated that his pain improved with activity. Dr. Picchioni increased Plaintiff's Tylenol dosage during the day and prescribed oxycodone to control the pain at night.

On October 15, 2015, Plaintiff returned to HSHC and saw Neha Sharma, D.O. (A.R. 512-19). Plaintiff reported that his pain was an eight out of ten with no medication, but lessened to three or four out of ten with oxycodone, which he took at night. Plaintiff described the pain as constant, worse when he was at rest at home and better when he was more active (A.R. 515). Plaintiff expressed a willingness to try physical therapy again, and Dr. Sharma provided Plaintiff with another referral.

On November 10, 2015, Plaintiff saw Dr. Greenbaum again for a follow up (A.R. 473-74). Plaintiff described his pain as a four out of ten intensity at rest but a seven out of ten with activity, and although it had not improved, neither had it gotten worse. Plaintiff reported having childhood hip issues (Perthes disease) and also recounted a "'bone scraping' of his right proximal humerus" (A.R. 473). However, upon examination, Dr. Greenbaum could not discern any scar over Plaintiff's right hip. On examination, Plaintiff's lumbar spine was tender and caused pain with extension, there were a positive impingement sign and a positive Stinchfield test, and a positive straight leg raise on the right. New x-rays showed no change from the earlier x-rays. Dr. Greenbaum assessed Plaintiff as having "mild to moderate right hip osteoarthritis possibly secondary to Perthes disease with significant deformity of his femoral head but at the current time well-preserved articular cartilage with possibly some superimposed pain secondary to lumbar facet arthropathy and radiculopathy" (A.R. 474). The doctor continued to recommend a cautious approach given Plaintiff's young age and lack of severe degenerative changes. Dr. Greenbaum referred Plaintiff to Pioneer Spine and Sports Physicians ("PSSP") for evaluation.

On November 11, 2015, Plaintiff began physical therapy again at Baystate Rehabilitation (A.R. 789-93). Pamela Prouix noted that Plaintiff described chronic lower back pain that had increased within the prior four months for no specific reason (A.R. 789). Though Plaintiff's plan

anticipated twice weekly sessions for four weeks to build up strength and improve his gait, Plaintiff was discharged around November 23, 2015 after missing three appointments (A.R. 788).

On November 12, 2015, Plaintiff returned to HSHC, seeing Dr. Sharma (A.R. 642-59). The notes from Plaintiff's appointment with Dr. Greenbaum were not yet accessible to Dr. Sharma. At this visit, Plaintiff described his pain as occasionally including numbness and tingling in his right leg, with some shooting pain down that leg (A.R. 655). Also, Plaintiff reported pain since having his leg "pulled" at physical therapy and at his NEOS appointment. Dr. Sharma also noted Plaintiff's twice weekly headaches and depression from financial stress (A.R. 656). Plaintiff reported receiving therapy for his depression.

On December 15, 2015, Plaintiff saw David Bowers, M.D., at PSSP (A.R. 478-81). Dr. Bowers noted that Plaintiff reported his lower back pain "symptoms occur mainly when lying down and with prolonged positions without particular pattern diminished somewhat by short-term change of position," though Plaintiff could not describe a particular alleviating position (A.R. 478). Plaintiff also reported that physical therapy "escalated his symptoms." The doctor also noted Plaintiff had had two falls within the past year. In the exam room, Plaintiff appeared to be in mild distress and changed positions tentatively secondary to hip-related pain (A.R. 479). On examination, Dr. Bowers noted tenderness in the lower lumbar area and discomfort with certain movements, which was also true of Plaintiff's right hip. The doctor's treatment plan was to start with right-sided lumbar facet injections (A.R. 480).

On December 16, 2015, Plaintiff returned to HSHC, seeing Ms. Kidder again (A.R. 506-11). Ms. Kidder noted that Plaintiff's plan included cortisone injections that month, and she renewed his prescriptions for pain medications (A.R. 509-10).

On December 29, 2015, Plaintiff received a cortisone injection in the right L4-5 and L5-S1 facet joint capsules (A.R. 596). Dr. Bowers noted that Plaintiff had difficulty staying in a static position for the L4-5 facet joint injection and that, for future injections, conscious sedation might be warranted. At his follow-up after the procedure, on January 4, 2016, Plaintiff reported improvement in his lower back pain (A.R. 563-65). Plaintiff continued to characterize the pain as a "C-shaped pattern from the groin into the lateral hip and into the gluteal and lower back margin. Symptoms occur[red] with static positioning such as sitting or lying down diminished somewhat by short-term change of position. He note[d] some radiation of pain into the right upper lateral leg to the knee" (A.R. 563). On a scale of one to ten for intensity, Plaintiff rated his average pain as a six. Based on Plaintiff's description of his pain, and the effect of the lumbar facet injections, Dr. Bower determined that Plaintiff's symptoms were primarily hip related. The doctor noted that "[h]is presentation [was] somewhat unusual as symptoms increase[d] with static positioning" (A.R. 564). The next step in Plaintiff's treatment plan was a right hip joint injection under fluoroscopy for diagnostic as well as therapeutic purposes.

On January 14, 2016, Plaintiff saw Amanda Fernandes, M.D., at HSHC for help with his disability transitional assistance paperwork (A.R. 499-505). Dr. Fernandez reviewed the findings from the doctors at NEOS and PSSP. For activities of daily living, Dr. Fernandez recorded that Plaintiff could cook meals, shower, get dressed on his own, go grocery shopping, drive, and use a computer (A.R. 503). The doctor noted that Plaintiff could get out a chair and up onto an examination table with no difficulty and that he appeared comfortable while reporting a pain level of eight out of ten. She noted, "While acknowledg[ing] [Plaintiff's] pain, his current ability to perform all his [activities of daily living], young age argue against the need for disability" (A.R. 503). Dr. Fernandez told Plaintiff that she was unable to "honestly fill out his

disability form" and discussed long term plans, including the possibility of finding work in a non-strenuous job.[5]

On January 15, 2016, Plaintiff had a hip injection (A.R. 597). Dr. Bowers noted that there were no complications. At his follow-up appointment on February 1, 2016, Plaintiff reported a 50% overall improvement in his hip pain (A.R. 566-68). Though the facet joint injections helped reduce his pain, Plaintiff still reported that he felt pain with prolonged standing and walking, lessened by short-term sitting (A.R. 566). Because physical therapy increased Plaintiff's pain, Dr. Bowers recommended Plaintiff continue with epidural injections to help manage the pain (A.R. 567).

On February 4, 2016, Plaintiff returned to HSHC (A.R. 493-98). He reported to Dr. Fernandez that the cortisone injections provided mild pain relief for a few days, but that his lower back pain was on-going and his hip pain was severe (A.R. 496). Plaintiff stated that his pain was beginning to impede his daily activities, such as showering. He had no trouble sleeping. Dr. Fernandez noted that Plaintiff appeared comfortable, though he rated his pain a ten out of ten, and that he had an antalgic gait, walking with a cane and leaning towards the right though he had no difficulty getting out of a chair. The doctor recommended continued follow up with providers at NEOS, PSSP, and HSHC.

On February 11, 2016, Plaintiff received an L4-5 selective epidural nerve root block along the L4 nerve, performed by Dr. Bowers (A.R. 576). There were no complications. On February 29, 2016, Plaintiff attended his follow-up appointment and reported positive

---

[5] Most of Plaintiff's appointments at HSHC were with medical residents supervised by Linda Canty, M.D. After this visit, Dr. Canty added an addendum which stated that it was in Plaintiff's best interest to get an opinion from PSSP and have PSSP review the disability forms. "There may be some work [Plaintiff] can do, though may need additional evaluations … to sort out his difficulties and treatment options" (A.R. 502).

improvement (A.R. 577-79). Though weight bearing activities increased his right lateral hip pain, "[s]ymptoms in this regard responded 50% to prior hip joint injection" (A.R. 577). Plaintiff reported an average pain of five to six out of ten in intensity. Dr. Bowers concluded that the epidural injections definitely improved Plaintiff's lower back pain and future care plans would focus on Plaintiff's hip pain (A.R. 578).

On March 3, 2016, Plaintiff returned to Dr. Greenbaum at NEOS (A.R. 580-81). Plaintiff reported that the back injections relieved his pain better than the hip injections did. He rated his pain as five out of ten in intensity at rest and eight out of ten with activity. Plaintiff reported generally the same functionality as he did at his August 2015 appointment (A.R. 580, 470). Dr. Greenbaum noted that new x-rays did not show any change from previous x-rays. The doctor's assessment was low back pain, previous right arm surgery, and possible left knee epiphysiodesis (A.R. 581). Dr. Greenbaum stated that Plaintiff did not have any interest in proceeding with surgical management and agreed that his back was more of a problem than his hip. Dr. Greenbaum suggested that Plaintiff might be a candidate for surgery in the future and should continue follow ups with NEOS periodically.

On March 17, 2016, Plaintiff went to HSHC to discuss disability with his primary care physician (A.R. 613). Dr. Sharma met with Plaintiff, and they determined that Plaintiff's ultimate goal should be to improve overall function so he could find a job (A.R. 616-19). The doctor referred Plaintiff to physical therapy again, this time only for his back as orthopedics recommended against physical therapy for his hip given the level of osteoarthritis (A.R. 616). Plaintiff also received a prescription for a shower bench (A.R. 617).

On March 30, 2016, there was an initial evaluation for another series of physical therapy appointments (A.R. 694-97). Plaintiff attended six sessions over the following month (A.R. 698,

700, 702, 704, 707).  Plaintiff's reports of pain hovered between a five to a seven on a scale of one to ten.  He required rest periods between exercises due to his pain.  By his fifth session, Plaintiff reported that he was in constant pain and had difficulty walking more than ten to fifteen minutes.  He also always used a cane for walking (A.R. 704).  By the sixth session, he reported no change to the pain in his back or hip (A.R. 709).

On April 21, 2016, Plaintiff returned to see Dr. Sharma at HSHC (A.R. 718-23).  The doctor noted that Plaintiff had been started on gabapentin by a psychiatrist, which he found helped a little bit (A.R. 718).  Plaintiff described pain in his left knee as sharp and shooting.  The doctor attributed the origin of this pain to Plaintiff's abnormal gait because of his right hip pain.  Plaintiff received a prescription for a TENS unit for his lower back pain (A.R. 724).

Plaintiff returned for four physical therapy sessions over a two-week period in May 2016, which completed all of his approved visits (A.R. 821-25, 818-20, 815-17, A.R. 811-13).  The sessions involved stretching and work with a TENS unit, as part of a home TENS unit trial (A.R. 823).  The discharge summary reflected a drop in Plaintiff's reports of pain to a three out of ten in intensity, with relief lasting six to eight hours after TENS unit treatment (A.R. 814).  Plaintiff had also become independent with his home exercise program.

On May 24, 2016, Plaintiff returned to HSHC for a follow-up for his lower back pain (A.R. 847-51).  He reported to nurse practitioner Jennifer Nesteby that he had received TENS therapy and it provided relief for about a day after each session.  Plaintiff stated that he needed a prescription for a home TENS unit and a brace for his right knee because he was experiencing pain.  Plaintiff felt that with his altered gait, his right knee was twisting when he walked.  Ms. Nesteby prescribed a home TENS unit and a knee brace (A.R. 847-48).

Three months later, on August 8, 2016, Plaintiff saw Dr. Sharma at HSHC for a follow up for his chronic back and knee pain (A.R. 841-46). Plaintiff reported that the knee brace really helped with walking, as his knee was no longer buckling (A.R. 841).

On September 8, 2016, Plaintiff saw Dr. Greenbaum at NEOS again (A.R. 789-99). For the first time in a visit to NEOS, Plaintiff complained of knee pain, although he reported that his right hip pain, concentrated in the groin, was more severe than his knee pain. Plaintiff reported that the pain was a seven out of ten in intensity at rest and lessened when walking. When asked about his functionality, Plaintiff stated that he walked with a limp; could walk ten to thirty minutes without a cane but used a cane much of the time; and remained independent with his activities of daily living (A.R. 789). Dr. Greenbaum noted no change in Plaintiff's new x-rays when compared to prior x-rays. The doctor concluded that Plaintiff continued to do reasonably well with nonsurgical management of his hip condition. Although Dr. Greenbaum had previously thought that Plaintiff's spine pathology was perhaps the driver of his pain, after reviewing the medical records from PSSP, the doctor concluded that Plaintiff's hip was the significant source of Plaintiff's pain. Dr. Greenbaum discussed the possibility of hip replacement surgery, but warned that given Plaintiff's "young age, his history of infection, and his lack of degenerative changes of his hip, [Plaintiff] would be at marked increased risk for complications" (A.R. 799). Plaintiff preferred to remain with nonsurgical management. The doctor ordered an MRI of Plaintiff's knee to explore the source of that pain.

On September 21, 2016, Plaintiff had another appointment at HSHC, this time with Safieh Golestaneh, M.D. (A.R. 836-40). Plaintiff reported that he had gone shopping with his daughters and afterwards felt an exacerbation of the pain in his right hip and that he was experiencing sleep disruption two to three times a night (A.R. 836). Dr. Golestaneh remarked

that, while Plaintiff's functional status was not normal, he was still able to complete activities of daily living. Though taking Tylenol was becoming less effective, the doctor decided Plaintiff could benefit from taking a nonsteroidal anti-inflammatory drug.

On September 22, 2016, Plaintiff had an MRI of his right knee to rule out a medial meniscal tear (A.R. 807-08). No tear was found, nor was there evidence of a recent transient patellar dislocation. There was evidence of an edema in the superolateral aspect of the Hoffa's fat pad and trace fluid in a Baker's cyst (A.R. 808).

On October 13, 2016, Plaintiff saw Dr. Sharma at HSHC for a follow up on his back and knee pain (A.R. 830-35). Dr. Sharma wrote about Plaintiff's functional status:

> [Plaintiff] can groom and dress and eat on own, however girlfriend assists with grocery shopping as he cannot walk for long distances, he is able to visit family/friends, can drive to and from doctor's appointment however not long distances as sitting down for too long worsens his chronic back and hip pain, patient cannot sit at a computer for too long either, standing/walking helps momentarily however walking long distances worsens pain, [Plaintiff] uses cane for assistance with gait

(A.R. 830). The medical notes reflect that Dr. Sharma completed the Massachusetts Department of Transitional Assistance EAEDC form (A.R. 831). The doctor recommended that Plaintiff follow up in three months, or earlier if needed.

On December 6, 2016, Plaintiff returned to NEOS for a recheck of his right knee (A.R. 882). He saw Mr. Puchalski, who noted Plaintiff's complaint of continued pain over the anterior aspect of his knee, causing difficulty with all weight-bearing activities, bending, and going up or down stairs. Mr. Puchalski determined that Plaintiff had patellofemoral syndrome and recommended anti-inflammatories, physical therapy, or cortisone injection therapy. Plaintiff wanted to try physical therapy.

In December 2016, Plaintiff began physical therapy for his knee. Although he had nine visits approved, he only attended four sessions, all in December 2016 (A.R. 871-77, 867-70, 864-66; 861-63). His treatment was discontinued on December 30, 2016 due to his poor attendance (A.R. 859). While Plaintiff was attending, the physical therapist worked on Plaintiff's lower extremity strength and how to sit down and get up to minimize knee pain. Plaintiff engaged in about thirty minutes of therapeutic exercise most sessions, and occasionally had his knee taped at the start of the sessions. By his fourth visit, Plaintiff reported no knee pain that day (A.R. 863).

On January 24, 2017, Plaintiff returned to NEOS for review of the condition of his right knee (A.R. 880). Plaintiff reported that he went to physical therapy but did not do a significant amount of stretching or strengthening or exercises. He also stated that he did not see a significant improvement of his right knee pain. Mr. Puchalski recommended a cortisone injection, to which Plaintiff consented, and which was performed during that visit. Plaintiff tolerated the procedure well.

On March 15, 2017, Plaintiff visited the Emergency Department at BMC, presenting with back and lumbar pain (A.R. 884-903). Liza Gonen Smith, M.D., noted that Plaintiff described the onset as sudden and abrupt, beginning the day before Plaintiff's emergency room trip (A.R. 884). Plaintiff stated that his right leg gave out while he was descending stairs and he fell backwards and hit his back on the stairs. An x-ray found no evidence of acute traumatic injury or significant degenerative disease (A.R. 903). Dr. Smith discharged Plaintiff with a prescription for oxycodone to use as his contusion healed until he could be seen by his doctor (A.R. 886).

On March 22, 2017, Plaintiff saw Ms. Kidder at HSHC for a follow-up to his emergency department visit (A.R. 948-54). Ms. Kidder noted that Plaintiff's pain had improved only a little since the previous week's fall, he took Percocet about three times a day, and he had no relief

with the TENS unit. Plaintiff complained of tightness in his back and pain when he bent at the waist (A.R. 948). Ms. Kidder renewed his prescription for Percocet for another week and gave Plaintiff another lidocaine patch. She and Plaintiff also discussed physical therapy if his pain did not improve (A.R. 950).

On April 6, 2017, Plaintiff returned to HSHC, seeing Dr. Sharma for his back pain (A.R. 941-44). Plaintiff reported that his back pain was worse, an eight out of ten usually and reduced to a three or four out of ten after Percocet. He rarely had a day when he did not feel an electric pain shooting down his leg (A.R. 943). He stated that neither the lidocaine patches nor the TENS unit were helping any more. Dr. Sharma provided a referral for Plaintiff to see a pain management specialist. Though she renewed Plaintiff's prescription for oxycodone, the doctor discussed with Plaintiff that it would not be refilled and that there were other medication options they would try next (A.R. 944).

On April 11, 2017, Plaintiff saw Mr. Puchalski for a check-up related to his right hip pain (A.R. 914). X-rays taken that day showed minimal degenerative changes. Mr. Puchalski discussed the diagnosis of osteoarthritis of the right hip. Plaintiff indicated he was satisfied with current treatment, involving Tylenol and diclofenac, as they were providing significant relief.

On May 4, 2017, Plaintiff again saw Dr. Sharma at HSHC (A.R. 938-40). The doctor noted that Plaintiff's pain was worse at night and the oxycodone helped. She noted that Plaintiff had an upcoming appointment with a pain management specialist, but that if there was no improvement, an opioid contract should be considered (A.R. 939). On June 2, 2017, Plaintiff again visited the Emergency Department at BMC, this time for his hip pain (A.R. 917-934). Plaintiff complained of increased right hip pain beginning earlier in the week, though there was no precipitating injury or trauma (A.R. 919). Gregory MacDonald, M.D., provided Plaintiff with

a short-term prescription for Percocet.  On June 22, 2017, Plaintiff had a follow up with Dr.

Sharma at HSHC (A.R. 936-37).  Her notes included a review of Plaintiff's visit with Pain

Management on June 15, 2017 (A.R. 980-83).  Because Plaintiff was an active patient at PSSP,

who were pain management specialists, her recommendation was that Plaintiff continue

treatment there (A.R. 936).  Dr. Sharma's notes listed the therapies and medications tried by

Plaintiff that brought no relief: gabapentin, lidocaine patches, Flexeril, physical therapy, and

steroid shots.  Plaintiff reported that the new medication, duloxetine, made him sleepy and did

not help with his pain.  That day, Plaintiff's right hip and knee pain were of more concern than

his back pain (A.R. 937).

On July 19, 2017, Plaintiff returned to PSSP for treatment to discuss a possible repeat

cortisone injection for his lower back pain (A.R. 976-78).  Dr. Bowers noted that Plaintiff

limped, favoring his right lower leg, and that he had diminished range of motion in his right hip

with groin region discomfort (A.R. 977).  The doctor recommended a treatment plan which

involved another round of lumbar facet injections to help with the pain.  If Plaintiff's radicular

symptoms became more pronounced, a selective epidural could be considered in the future (A.R.

978).  On August 2, 2017, Dr. Bowers performed a facet injection procedure on Plaintiff in the

L4-5 and L5-S1 facet joint capsules (A.R. 985).  Plaintiff had poor tolerance due to extreme

sensitivity.

C.      Records Related to Mental Health Treatment

Plaintiff was treated at the Gandara Center for his mental health starting on June 21, 2015

(A.R. 409-26).  At intake, Plaintiff presented within normal limits in behavior, speech, emotional

state (both mood and affect), and perception (A.R. 414).  He also presented within normal limits

as to thought content, thought process, intellectual functioning, orientation, memory, insight, and

judgment (A.R. 415).  Plaintiff's current need area was listed as depression and sadness, and the diagnosis was anxiety disorder (A.R. 418, 421).  The treatment plan involved biweekly individual treatment.  On September 21, 2015, Plaintiff had a three-month review of treatment (A.R. 457-58).  There were no significant changes in presentation or treatment noted.  On December 21, 2015, Plaintiff had a six-month treatment review (A.R. 459-60).  Again, no change was noted.

In March 2016, Plaintiff underwent a psychiatric evaluation (A.R. 461-66).  He presented within normal limits in behavior and perception, but his speech was slowed and his emotional state and facial expression were depressed and sad (A.R. 463).  His thought content, orientation, insight, judgment, and thoughts were all within normal limits.  However, his thought process showed decreased thought flow, he had impaired concentration and a short attention span (A.R. 464).  Plaintiff was started on Cymbalta for depression and Neurontin for anxiety and sleep (A.R. 466).  On April 27, 2016, Plaintiff's Cymbalta prescription stayed the same, but he dropped Neurontin and added Prozac and Seroquel (A.R. 467).

There are treatment notes from the Gandara Mental Health Center showing that Plaintiff dropped his Cymbalta medication around May 2016 but kept taking his other medications at least through December 2016 (A.R. 828).[6]

D.     Opinion Evidence

On January 1, 2016, as part of Plaintiff's initial disability determination, state agency reviewer Ludmila Perel, M.D., assessed Plaintiff's limitations based on her review of the medical

---

[6] The records for these prescriptions are largely illegible (A.R. 973-74).  An additional exhibit appears to be another psychiatric evaluation, but it is undated (A.R. 955-72).  Based on a notation about Plaintiff's last primary care physician visit, it appears that this record was made after July 2017.  It shows no material change in Plaintiff's condition or treatment.

evidence of record (A.R. 154-56).  Dr. Perel found that Plaintiff was limited to occasional lifting or carrying of no more than 20 pounds; frequent lifting or carrying of 10 pounds; standing or walking with normal breaks for a total of 2 hours; sitting with normal breaks for about 6 hours of an 8-hour day; only occasional balancing, stooping, kneeling, crouching, crawling, or climbing of stairs or ramps; no climbing of ladders or scaffolding; no concentrated exposure to extreme cold or vibration; and no exposure to hazards such as machinery or heights.  Dr. Perel identified Plaintiff's back, right hip, and right knee pain as a basis for the restrictions (A.R. 155).  On May 29, 2016, on reconsideration, Alice Truong, M.D., agreed with Dr. Perel.

Joan Kellerman, Ph.D., conducted a state agency record review related to Plaintiff's claim of disability based on depression.  She concluded that Plaintiff had mild symptoms of depression and anxiety but that his functioning appeared unrestricted by those symptoms (A.R. 144).  She found that he had no restrictions on his activities of daily living or in maintaining social functioning and that he had mild difficulties in maintaining concentration, persistence, and pace.  There was "insufficient" evidence of any episodes of decompensation (A.R. 143).  On reconsideration, on June 21, 2016, Sandra Diaz, Ph.D., found that Plaintiff's anxiety-related disorders caused mild restrictions in activities of daily living, maintaining social functioning, and in concentration, persistence, and pace and that Plaintiff had experienced no episodes of decompensation (A.R. 168).  She commented that there was no evidence in the medical records that care providers had concerns about changes in Plaintiff's mental status or level of functioning that would have required hospitalization (A.R. 169).

On June 14, 2016, Plaintiff visited Leon Hutt, Ph.D., for a consultative examination (A.R. 725- 27).  Plaintiff described his depression as affecting him one to two days a week, which Plaintiff then revised to two to three days a week.  Plaintiff described the depression as

beginning about a year earlier and making him feel like he did not want to do anything. Plaintiff attributed the depression to his physical impairments and stated that his sleep was very disrupted (A.R. 726).

Dr. Hutt noted that his mental status evaluation of Plaintiff was hampered because of Plaintiff's limited comprehension of, and expressive skills in, English (A.R. 726, 727). Nonetheless, Dr. Hutt found Plaintiff to be fully alert, with appropriate affect, and with a fair attentional capacity. Dr. Hutt gauged his intellectual function as in the low average to average range. The doctor opined that Plaintiff had an adjustment disorder with depressed mood and assigned a GAF score of 60. He believed that Plaintiff was competent to manage his own finances. Dr. Hutt observed that he "[did] not know whether [Plaintiff] [wa]s able to tolerate stressors associated with employment" and that Plaintiff might be better served by an evaluator who spoke Spanish (A.R. 727).

On March 22, 2017, Willard Brown, D.O., conducted a consultative exam for disability evaluation services, with the help of an interpreter (A.R. 909-12). The chief complaints addressed by Dr. Brown were low back pain, hip pain, childhood Perthes disease, facet syndrome, and right knee pain (A.R. 909). Dr. Brown reviewed Plaintiff's medical history with him and examined him. Plaintiff stated that with time and patience he could take care of personal hygiene, including dressing himself (A.R. 910). Plaintiff said that he could not stand in one place too long; he did not walk much and, when he did, he avoided stairs; and he could drive when necessary but limited himself to the local area. On examination, Dr. Brown found that Plaintiff had a 40% restricted range of motion in the lumbar spine and limited extension and flexion. Plaintiff reported a four out of ten level of intensity for pain. Dr. Brown could not fully test Plaintiff's hip because of Plaintiff's discomfort (A.R. 910-11). The doctor's examination of

Plaintiff's knees did not reveal any abnormalities or concerns (A.R. 911). Dr. Brown noted as his impressions chronic low back, right hip, and right knee pain.

      E.     <u>Hearing Testimony</u>

Plaintiff and vocational expert ("V.E.") Larry Takki testified at the July 31, 2017 hearing (A.R. 115-38). Plaintiff gave his work history, including employment as a dispatcher/loader and housekeeper (A.R. 120-21). On the topic of his physical condition, Plaintiff testified that the most significant issues that kept him from working were his hips and back (A.R. 122). He said he also had a lot of pain in his knee and that it "dislocated" on occasion (A.R. 123). Plaintiff had been using a cane for about a year and a half to help his knee so it would not dislocate while he was walking. He rated the level of pain in his hip, back, and knee on a day without medication as a ten out of ten. With medication, it would be a four out of ten. Plaintiff had no side effects from his medications. Plaintiff initially denied limitations attributable to mental health (A.R. 124). Asked specifically about depression, he said he sometimes felt depressed. In terms of daily activities, Plaintiff cooked his own meals, sometimes washed his own clothes, and bathed, groomed, and dressed himself with difficulty. He had no hobbies and did not belong to any clubs or social organizations. Within the past month, he had traveled to Puerto Rico on a weekend for a family wedding (A.R. 125-26).

Plaintiff said he was unable to work because he had great difficulty either sitting, standing, or walking for very long and he could not lift heavy objects (A.R. 126). His lower back was always uncomfortable and strong shock-like pains would come and go (A.R. 127). The pain worsened when Plaintiff bent over or tried to lift something. Elevating his legs to take pressure off his back and using the TENS unit helped reduce the pain. Walking or moving too much caused a sharp pain in his hip (A.R. 128). He was too young for a hip replacement and no

other interventions had helped.  His knee pain came and went, but what bothered him most was the occasional dislocation (A.R. 129).  Injections made the knee feel worse.  A knee brace helped by providing more support and control.  Plaintiff testified that he could only sit for about thirty minutes before he would have to get up and move and that he could not stand still for more than ten minutes.  He could not walk more than twenty-five minutes, and he found it painful to go up or down steps.  His sleep was disturbed because of pain so he usually felt tired and sleepy during the day and sometimes took naps (A.R. 131).  He found it hard to concentrate and focus due to his pain.

The ALJ asked the V.E. to assume a hypothetical individual with Plaintiff's background and characteristics who was limited to light exertion with tasks that were simple and routine and that did not require overhead lifting or reaching or the operation of right foot or leg controls.  The work should allow for English illiteracy and have no more than incidental exposure to extremes of cold or vibration.  Additionally, the work should not be performed at heights using ladders, ropes, or scaffolding, or involve dangerous moving machinery (A.R. 134).  The V.E. opined that such an individual could not perform Plaintiff's past work but could perform the work of a sub-assembler of electronics, an office cleaner, or an assembler of communication equipment and that such jobs were available in the national economy (A.R. 134-35).  When the hypothetical was modified to limit the exertional level to sedentary with the same restrictions, the V.E. identified the occupations of addresser or address clerk, table worker, and computer assembly.  If the person were off task twenty-five percent of the time or were absent two or more days a month, the V.E. opined that all work would be precluded (A.R. 135-37).

F.      The ALJ's Decision

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of August 1, 2014 (A.R. 86). At the second step, the ALJ found that Plaintiff had the following severe impairments: osteoarthritis resulting from hip dysplasia, arthropathy, degenerative disc disease, spondylosis, and anxiety disorder (A.R. 86). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, "with specific consideration given to Sections 1.00 and 12.00 of the Listing of Impairments" (A.R. 86).

Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to work involving simple, routine tasks. He must avoid direct overhead lifting and reaching and the operation of right foot and leg controls. The [Plaintiff] is limited to work that allows for English [il]literacy.[7] He is limited to work that allows for no more than incidental exposure to extremes of cold and vibration. [Plaintiff] must avoid work performed at heights, ladders, ropes, and scaffolding. He must avoid dangerous, moving machinery.

(A.R. 88). The ALJ further found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (A.R. 90).

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. At step five, the ALJ concluded that he could perform jobs found in significant numbers in the economy and, therefore, was not disabled (A.R. 105-06).

IV.   ANALYSIS

---

[7] The reference in the RFC to "English literacy" is plainly a typographical error. The ALJ asked the V.E. to assume English illiteracy at the hearing, which was conducted with an interpreter's assistance.

Plaintiff contends that the Commissioner's decision should be reversed because the ALJ erred by: (1) failing to accept Dr. Hutt's opinion about Plaintiff's ability to tolerate the stressors of the workplace; (2) failing to find that Plaintiff's right knee pain was a severe impairment at step 2 of his analysis; and (3) finding that Plaintiff's statements about the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. The court will address each contention in turn.

A. Dr. Hutt's Opinion

Plaintiff contends that the ALJ erred by failing to adopt Dr. Hutt's statement that he did not know whether Plaintiff would be able "to tolerate the stressors associated with full-time employment" (A.R. 727) and failed adequately to explain why he (the ALJ) rejected this statement that Plaintiff characterizes as an opinion or conclusion that Plaintiff might not be able to tolerate the stress of full-time work (Dkt. No. 15 at 9-10). Citing *Rose v. Shalala*, 34 F.3d 13 (1st Cir. 1994), Plaintiff argues that, in rejecting what he characterizes as Dr. Hutt's opinion, the ALJ has impermissibly substituted his opinion for an uncontroverted medical opinion. Plaintiff seeks to place weight on this statement that the statement cannot sustain.

As the government contends, Dr. Hutt's statement about Plaintiff's ability to tolerate the stressors of work is ambiguous. Dr. Hutt's concluding paragraph of his evaluation, in full, provides as follows: "I see [Plaintiff] as competent to manage his own finances. I do not know whether [Plaintiff] is able to tolerate stressors associated with full-time employment. [Plaintiff] could probably be better served by being evaluated by a Spanish-speaking professional" (A.R. 727). It is not clear whether Dr. Hutt formed the opinion that Plaintiff might not be able to tolerate stressors associated with work, or whether his statement is more fairly read as an observation that he was unable to come to an opinion one way or the other on this point, possibly

because of a language barrier. As the ALJ recognized, Dr. Hutt assigned Plaintiff a global assessment of functioning ("GAF") score of 60, which indicates only "moderate difficulty in social, occupational, or school functions (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). *See also Patoski v. Berryhill*, 320 F. Supp. 3d 283, 290 (D. Mass. 2018), *aff'd without op.*, 2019 WL 2574591 (June 24, 2019) (concluding that the ALJ appropriately determined that a GAF score of 60 indicated only a moderate impairment in overall functioning). Dr. Hutt's assignment of a GAF score of 60 suggests that Dr. Hutt's statement is more appropriately read as indicating a doubt that he had obtained sufficient information to form an opinion on the question of Plaintiff's ability to function in the workplace. *See Barton v. Astrue*, No. 10-cv-151-PB, 2011 WL 2412955, at *6 (D.N.H. June 14, 2011) (stating that the medical statements upon which the plaintiff relied were "equivocal at best" and were not "akin to a conclusion that [the plaintiff] could not complete simple, repetitive, routine tasks that involve only occasional interaction with co-workers and supervisors, as the ALJ determined").

The ALJ found Dr. Hutt's assessment of Plaintiff's mental health status to be well-documented and worthy of significant weight in part because the doctor did not base his report predominantly on Plaintiff's statements about his mental health status. While Dr. Hutt acknowledged a language barrier and the resulting limitations in his ability to assess Plaintiff, he nonetheless conducted a mental status examination, observing that Plaintiff was polite, cooperative, alert and oriented to time, spoke clearly, coherently and to the point, had an appropriate affect, exhibited no psychosis, had intelligence in the low average to average range, and seemed to have an attentional capacity that was fair for purposes of the interview (A.R. 726). The ALJ accepted these aspects of Dr. Hutt's evaluation as supporting the limitation in the RFC

to simple, routine tasks (A.R. 103).  The ALJ was charged with weighing Dr. Hutt's opinion in conjunction with the record as a whole.  *See, e.g., Coren v. Colvin*, 253 F. Supp. 3d 356, 359 (D. Mass. 2017) (stating that, in weighing medical opinions, "the ALJ can consider whether they are consistent with the 'record as a whole'" (quoting 20 C.F.R. § 416.927(c)(4))).  The ALJ's findings about Plaintiff's mental health status are consistent with the record.  Although on occasion Plaintiff  presented to his therapist with a depressed affect and impaired concentration (A.R. 463-64), his thought content, insight, judgment, and thoughts were consistently judged to be within normal limits (A.R. 415, 464).  Plaintiff's treatment providers adjusted his medication, but there was never a significant change in his treatment or prognosis (A.R. 457-60).  He was never seen in an emergency room or hospitalized for a mental health impairment.  At the hearing, when asked if he had any problems with his mental health status, Plaintiff first replied "no" and then clarified that he "sometimes" felt depressed (A.R. 124).

"[T]he ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee*, 744 F. App'x at 6 (quoting *Rodriguez*, 647 F.2d at 222-23).  This court does not "find facts, decide issues of credibility, draw inferences from the record, [or] resolve conflicts of evidence."  *Id.* (citing *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)).  Those functions are the exclusive province of the ALJ.  The ALJ reviewed all of Plaintiff's mental health treatment records (which were sparse) and adequately described the basis for his findings of no, mild, or moderate limitations (A.R. 86-88).  Plaintiff points to nothing in the record that would call into question the ALJ's findings concerning his mental health status, which were generally consistent with those of the state

agency reviewers, to whose opinions the ALJ permissibly assigned some weight (A.R. 104-05). *See, e.g., Bourinot v. Colvin*, 95 F. Supp. 3d 161, 179-80 (D. Mass. 2015) (concluding that an RFC assessment from a non-examining state agency reviewer that is based on a review of records from a claimant's treating sources may constitute substantial evidence to support a finding of non-disability). The ALJ's decision is sufficiently explained and adequately supported by substantial record evidence.

### B. Plaintiff's Knee Impairment

Plaintiff argues that the ALJ erred by failing to address at step 2 whether Plaintiff's pain and the other symptoms related to his right knee constituted a severe impairment. The court agrees that the ALJ committed a step 2 error. Plaintiff applied for DIB based, in part, on problems with his right knee (A.R. 311). Those problems included pain, swelling, and so-called dislocations or occasions when his knee gave out. There is no doubt this problem persisted for more than a year: according to the record, Plaintiff brought the problem to the attention of various medical providers beginning as early as October 2013 (A.R. 729) and continuing at least through March 15, 2017, when Plaintiff visited an emergency department after his right leg gave out while he was walking down stairs (A.R. 844). On this record, the ALJ was not entitled to simply overlook Plaintiff's problem with his right knee at step 2.

"The analysis does not end here, however. It is well-settled that 'a claimant cannot demonstrate harmful error at [s]tep [2] unless the failure to make severity findings ends the analysis.'" *Page v. Berryhill*, No. 3:17-cv-30093-KAR, 2018 WL 6834594, at *9 (D. Mass. Dec. 27, 2018) (quoting *White v. Colvin*, No. CA 14-171 S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015)); *see also, e.g., Caterino v. Berryhill*, 366 F. Supp. 3d 187, 194 (D. Mass. 2019) (concluding that, even assuming the ALJ erred at step 2 by not listing fibromyalgia as a severe

impairment, any such error was harmless "because the ALJ found other severe impairments and considered the cumulative effect of those impairments on [plaintiff's] RFC"). In the instant case, the ALJ found severe impairments at step 2 (A.R. 86) and considered the cumulative effect of all of Plaintiff's impairments in crafting the RFC. The ALJ's decision included review of Plaintiff's treatment for knee pain, including imaging, physical therapy visits, and cortisone injections (e.g., A.R. 88, 92, 97-99). The RFC called for sedentary work "which, by definition, required only occasional walking and standing," *Page*, 2018 WL 6834594, at *10,[8] with no operation of right foot and leg controls (A.R. 88). Plaintiff must do more than demonstrate the existence of an impairment. He must show how that impairment, considered with other impairments, limited his functional capacity to a degree inconsistent with the ALJ's RFC determination. *See Caterino*, 366 F. Supp. 3d at 194-95. No treating care provider stated that Plaintiff had functional limitations beyond those in the RFC attributable to his knee impairment, nor has Plaintiff pointed to any evidence connecting his knee impairment to limitations beyond those determined by the ALJ. *See id.* "The decision reflects that the ALJ considered any limitations posed by the [knee problem] at Step 4. As such, any error that the ALJ made in failing to include the [knee problem] at Step 2 was harmless." *Lewis v. Astrue,* 498 F.3d 909, 911 (9th Cir. 2007); *see also Perez v. Astrue*, Civil Action No. 11-30074-KPN, 2011 WL 6132547, at *4 (D. Mass. Dec. 7,

---

[8] The Social Security Administration regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

2011) ("Any [step 2] error . . . was harmless, however, as the ALJ explicitly considered 'all symptoms,' both severe and non-severe, in assessing Plaintiff's [RFC] and there is no indication that the ALJ failed to consider the cumulative effect of these impairments.").

C.   The ALJ's Evaluation of Plaintiff's Reports of Disabling Pain

Finally, Plaintiff argues that the ALJ erred by rejecting his claims of disabling pain from his hip and back on the grounds that providers treating Plaintiff for hip and back pain often noted that Plaintiff was not in "acute distress" (Dkt. No. 15 at 15).  Social Security Ruling 16-3p outlines the process an ALJ uses to evaluate claims of disabling pain and other symptoms, which are defined as "the individual's own description or statement of his or her physical or mental impairment(s)."  SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).  An ALJ is directed to "consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record."  *Id.*  The analysis is a two-step process.  *Id.*  The ALJ first considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."  *Id.* at *3.  If an "underlying physical or mental impairment that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  *Id.*  An ALJ must consider "the entire case record" in making his finding regarding the intensity and persistence of the claimant's symptoms and the extent to which they limit the claimant's ability to perform work-related activities.  *Id.* at *5-10.  An ALJ must evaluate subjective complaints of pain in "in accordance with … six factors: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and

aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities." *Hardin v. Barnhart*, 468 F. Supp. 2d 238, 248 (D. Mass. 2006) (citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 27-30 (1st Cir. 1986); *Lopes v. Barnhart*, 372 F. Supp. 2d 185, 192 (D. Mass. 2005)).

Here, the ALJ acknowledged the osteoarthritis in Plaintiff's right hip and lower back pain from degenerative disc disease and spondylosis as medically determinable impairments that could reasonably be expected to cause the symptoms Plaintiff alleged that he experienced (A.R. 86, 90). In concluding that Plaintiff's statements about intensity, persistence, and limiting effect of the pain were not entirely consistent with the medical and other evidence in the record, the ALJ appropriately noted that Plaintiff's care providers regularly recorded that, when he presented for evaluations, he was not in acute distress (A.R. 101). The nature and intensity of a claimant's pain are among the *Avery* factors an ALJ is directed to consider. *See Brown v. Colvin*, 111 F. Supp. 3d 89, 101 (D. Mass. 2015) (concluding that the ALJ properly questioned the intensity of the plaintiff's pain where the medical record contained reports from medical providers that the plaintiff did not appear to have acute pain).

Contrary to Plaintiff's assertion, the ALJ did not rely exclusively on these notations of no acute distress in Plaintiff's medical records in deciding not to fully credit Plaintiff's assertions of disabling pain. He noted that Plaintiff's function report indicated that he prepared his own meals, dressed himself, did some cleaning, drove a car, and shopped in stores. He was able to use a computer (A.R. 90). At the hearing, Plaintiff related that he had recently traveled to Puerto Rico for a weekend for a family occasion (A.R. 126). The ALJ also observed that Plaintiff did

not exhibit pain, discomfort or anxiety during the hearing. "This constitutes 'more than a scintilla of evidence' to support the credibility determination." *Johnson v. Colvin*, 204 F. Supp. 3d 396, 413 (D. Mass. 2016) (citing *R & B Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd.*, 618 F.3d 37, 44 (1st Cir. 2010)) (concluding that the ALJ's adverse credibility finding was sufficiently supported where the record showed that the plaintiff engaged in a wide range of activities of daily living and did not appear physically uncomfortable or anxious during the hearing).

The extensive medical records, summarized in detail by the ALJ, included conflicting evidence about the severity of Plaintiff's medical problems and his claims of pain. On the one hand, in August 2015, Dr. Greenbaum of NEOS noted that Plaintiff's history, physical examination and radiographs were consistent with mild to moderate right hip osteoarthritis (A.R. 92, 472). At this visit, Dr. Greenbaum noted that "to some extent, some of [Plaintiff's] pain and functional limitations are out of proportion to radiographs" (A.R. 472). In January 2016, Dr. Fernandes noted that Plaintiff appeared "comfortable" while reporting a pain level of 8 out of 10 (A.R. 503). Plaintiff was discharged from physical therapy twice for failing to appear for appointments (A.R. 92-93). *See Russell v. Barnhart*, 111 Fed. App'x 26, 27 (1st Cir. 2004) (unpublished; per curiam) ("A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions and supports an ALJ's decision to deny benefits."). On two occasions, treating care providers expressed reservations about supporting Plaintiff's claim of disability (A.R. 503, 753). In April 2017, Plaintiff reported to Mr. Puchalski that he was happy with his current pain level (A.R. 100) and, at the hearing, Plaintiff reported that, with medication, his pain level was four on a ten-point scale (A.R. 124). Finally, as the ALJ noted, none of Plaintiff's treatment records reflected restrictions placed on Plaintiff by a treating

care provider (A.R. 105).  On the other hand, there is no doubt that Plaintiff treated with a range

of providers on a regular basis, reported severe pain to those providers and often exhibited

behavior consistent with pain.  It is well settled that resolving such conflicts in an administrative

record and making credibility determinations are the province of the ALJ.  *See Applebee*, 744

Fed. App'x at 6.  "'Even if the record could arguably support a different result,' this court must

affirm the ALJ's conclusion [when, as in this case, it is] supported by substantial evidence."

*Conner v. Barnhart*, 443 F. Supp. 2d 131, 137 (D. Mass. 2006) (quoting *Rodriguez Pagen v. Sec.*

*of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987)).

V.    C̲ᴏɴᴄʟᴜsɪᴏɴ

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 14)

is DENIED.  The Defendant's Motion to Affirm the Commissioner (Dkt. No. 16) is ALLOWED.

The Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated:  September 19, 2019                        /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 United States Magistrate Judge